# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

The property to be searched is a SAMSUNG GALAXY S7 MODEL SM-G930T IME number [359755070494790], hereinafter the "Device." The Device is currently located at Greendale Police Department.

Case No. **18-M-113 (DEJ)**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 18, United States Codes, Sections 922(g)(1) and 1201.

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

ATF Special Agent Luke Barker
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: Aug. 3, 2018  2:33 p.m.

*Judge's signature*

City and State: Milwaukee, Wisconsin     Hon. David E. Jones, U.S. Magistrate Judge
*Printed Name and Title*

IN THE UNITED STATES DISTRICT COURT
FOR EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION CONTAINED IN THE SAMSUNG GALAXY S7 MODEL SM-G930T SMARTPHONE WITH UNIQUE IDENTIFYING #359755070497490 | Case No. 18-M-113 |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Luke Barker, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent of the United States Justice Department, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), currently assigned to the Milwaukee Field Office. I have been so employed since November 2015. My duties as a Special Agent with ATF include investigating alleged violations of the federal firearms, explosives, and arson statutes.

3. I have over 10 years of law enforcement experience. I have completed approximately 26 weeks of training at the Federal Law Enforcement Training Center (Glynco, Georgia), as well as the ATF National Academy. That training included various legal courses related to Constitutional Law as well as search and seizure authority. Additionally, I have received training on how to conduct various tasks associated with criminal investigations, such as: interviewing, surveillance, and evidence collection. As a police officer for the Aurora Police Department, I had experience in a multitude of criminal investigations. In addition to my regular

1

duties I received training in drug interdiction, drug identification, gangs, and interviews and interrogations.

4. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

5. The property to be searched is a SAMSUNG GALAXY S7 MODEL SM-G930T IME number [359755070494790] hereinafter the "Device." The Device is currently located at Greendale Police Department.

6. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

7. On June 9, 2018, at approximately 2:51 am, Greendale Police Officer Ryan Schwabenlander was dispatched to 6627 Greenway, Apt. 2, for a report of a kidnapping. Schwabenlander spoke to a R.K who stated her mother, A.K was just forcefully removed from their apartment. R.K stated her mother was taken by Wayne GRILLS (M/W DOB: XX/XX/1962), her mother's ex-boyfriend.

8. R.K stated she was in her bedroom sleeping when she awoke to commotion outside of her room. R.K said she looked out of her bedroom door and saw her mother and GRILLS standing in the doorway of her mother's room, which was right across the hall from R.K's bedroom.

9. R.K stated that she heard her mom say "oh god no" before telling R.K and her siblings to stay in their rooms. R.K stated GRILLS appeared very aggressive and angry. GRILLS was walking behind A.K as he was forcing her to walk only in one direction toward the living

2

room. R.K stated that after she got dressed, she looked through the apartment for her mother but she was not in the apartment. R.K then walked outside to look for her mother, but could not find her. R.K stated her mother left the apartment without her purse, keys, cellular telephone or shoes.

10. R.K also stated that once her mother and GRILLS left the apartment, she noticed that the front window and screen were both open. R.K stated that her mother will crack the window for air but never opens the window and screen completely. R.K stated that the plastic on the bottom of the window was also broken.

11. Greendale Police Sergeant (Sgt) NOSTER located the cellular telephone number for GRILLS, (773) 877-9300. Sgt NOSTER called the phone number and the call was answered by A.K. Sgt NOSTER stated A.K's voice was shaky and she sounded like she had been crying. A.K told Sgt NOSTER she was driving around with GRILLS and stated that she was okay. Sgt NOSTER stated it appeared that GRILLS was coaching A.K on how to answer his questions. Sgt NOSTER stated that he believed that A.K was in danger.

12. Sgt NOSTER then spoke with GRILLS who stated he and A.K were driving on I-43 and that they were both ok. SGT NOSTER asked GRILLS to return to the Greendale Police Department, however, GRILLS never showed up. Sgt NOSTER contacted GRILLS a second time. GRILLS stated he would respond to the Greendale Police Department, however, he never showed.

13. Sgt NOSTER utilized fonefinder.net and determined that phone number (773) 877-9300 belonged to T-Mobile and was not ported-subscriber information was changed. Sgt NOSTER submitted an exigent circumstance form to T-Mobile. Sgt NOSTER received several responses indicating that the telephone was turned off. At 05:59 hours, Sgt NOSTER received a ping email showing GRILLS' phone near the area 1535 N 20th Ave, Melrose Park, Illinois

3

60160. In-house records indicated that GRILLS' address was 1532 N 19th Ave, Melrose Park, Illinois 60160.

14. Greendale Police Officer ZAINER had taken a statement from R.K's aunt, K.L. On 6/9/2018, at 5:37 a.m., L.L received a telephone call from A.K from telephone number (847) 740-7000. A.K stated she was okay and told L.L that she was at a BP gas station in Illinois. L.L received a second phone call from A.K at 6:23 am from the same telephone number.

15. Upon conducting a google search of telephone numbers (847) 740-7000 and (773) 877-9300, both came back to "White Glove Cleaning and Restoration." The numbers were associated to GRILLS. Both numbers were checked in the LexisNexis Accurint database and found to be associated with GRILLS.

16. On June 9, 2018, at 7:30 am, Officer Schiller of the Melrose Police Department located A.K and GRILLS in the garage of 1532 N 19th Avenue, Melrose Park, Illinois. GRILLS was taken into custody by Melrose Police Department.

17. Greendale Police Detective Durkin and Officer Vlaj responded to Melrose Police Department and made contact with A.K. During the interview, Detective Durkin could see A.K'S hands were shaking and noticed she was crying following is a summary of the statement made by A.K.

18. A.K stated last night she and her children were all asleep in their apartment at 6627 Greenway, Apt 2. A.K said she was asleep in her room and her children were asleep in their own rooms. A.K stated she kept one of the windows in the living room partially opened for her son, who has some medical conditions.

19. A.K stated at approximately 2:00 am she was partially awaken by someone standing at the end of her bed. A.K said she thought it was one of her children.

4

20. A.K stated when she woke up and opened her eyes she recognized GRILLS standing in her room. A.K said she screamed and GRILLS told her to, "shut the fuck up!" A.K stated she thinks she continued to scream. GRILLS told her to get up because he wanted to talk with her outside.

21. A.K said she got up, and both of her daughters opened their bedroom door. GRILLS told A.K to "tell the girls to close the door." A.K told her daughters to go back in their rooms and that everything was ok, and they were just going to go outside and talk. A.K said GRILLS kept yelling at her to get outside. A.K stated she grabbed a flannel shirt.

22. A.K stated GRILLS walked behind her with his hands on her backs and arms directing her movement. A.K stated they walked outside and GRILLS directed her around the corner to the patio of her neighbors' apartment. GRILLS then picked up a handgun that he had hidden behind a bag of charcoal. A.K stated she screamed. GRILLS kept telling her, "Shut the fuck up!" While GRILLS was pointing the handgun at A.K, GRILLS ordered A.K to get in the van, or he would go in the apartment and shoot the kids. A.K stated she agreed, for fear of her children's safety to go with GRILLS.

23. Once in the vehicle and driving away, A.K said GRILLS began yelling at her and blaming her for their failed relationship and his failed business. A.K stated at one point GRILLS pulled out his gun and put it to his head.

24. A.K said GRILLS told her, "I would never do anything to hurt you." GRILLS stated, "you will see your kids again." A.K stated somewhere in Illinois, she stopped at a 7-Eleven gas station. GRILLS went inside the gas station to buy coffee and cigarettes. GRILLS exited the gas station and said, "what the fuck are you doing, get back into the van." A.K stated

5

she told GRILLS she had to use the bathroom. GRILLS told her, they didn't have a bathroom. GRILLS told her, "get back in the fucking car!"

25. A.K stated GRILLS drove them to an empty parking lot with no other cars. While parked in the parking lot A.K stated GRILLS told her he wanted to "lay with her" in the back of the van. They both got into the back of the van at which point GRILLS began to have sex with A.K. A.K stated there was no way out of the van and GRILLS was laying on top of her. A.K stated she did not tell him "no" or that she didn't want to have sex but feared that she had to or else GRILLS would hurt her. A.K said that after they had sex GRILLS stated, "There is nothing left for me, the police are after me, they are coming for me, and it's not going to end well."

26. A.K stated they left the parking lot and went to a gas station. While there, A.K tried getting out of the van, but GRILLS told her to get back in. A.K stated GRILLS allowed her to call her sister KYRIE but GRILLS had the phone on speaker and was controlling what she was saying.

27. A.K stated they drove back to GRILLS' residence and parked in the alley. A.K said that while GRILLS got out of the van to open the garage door, she removed the handgun from GRILLS' vest and hid it under her seat. Once she and GRILLS were inside of the garage GRILLS looked for his handgun in his vest but could not find it. A.K said she told GRILLS she had thrown it in a garbage can in the alley. A.K said that while GRILLS was searching for his handgun in the alley she tried to run away.

28. A.K stated while she attempted to run away, GRILLS ran after her and caught up to her. GRILLS started to drag A.K BACK into the garage. GRILLS stated, "I don't want to hurt you, but get into the fucking garage. GRILLS forced A.K to show where his handgun was. After she retrieved the handgun from under the seat in the van, GRILLS told A.K to hide the handgun

6

in a dog kennel outside of the garage. GRILLS told A.K he knew the police were coming for him.

29. A short while later Melrose Park Police Department arrived and placed GRILLS in custody.

30. Greendale Detective Durkin asked A.K if she gave GRILLS consent to forcefully remove her from her apartment, while GRILLS was pointing a pistol her, and forcefully make her get into his van and travel to Illinois. A.K stated no. A.K reiterated that the duration of this traumatic incident, she feared GRILLS was going to kill her. A.K stated GRILLS seemed very desperate and she was afraid she would never see her children again. A.K stated she had sexual contact with GRILLS and he did ejaculate inside of her vagina. A.K stated she felt forced to have sexual intercourse with GRILLS, because based on his previous threats to kill her children, she didn't know if she was ever going to see her children again if she did not comply.

31. The Device is currently in storage at Greendale Police Department. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the Greendale Police Department.

**TECHNICAL TERMS**

32. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or

7

traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected

8

to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

c. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

d. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

e. According to manufacturer specifications, the SAMSUNG GALAXY S7 MODEL SM-G930T has GPS/location service capabilities, which means the phone can capture specific coordinates as to where it is and has been located in the world. The cellphone also has internet access, video capability, and photograph capability. This specific cellphone also has a SIM card installed.

33. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

9

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

34. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

35. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

10

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

36. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

11

37. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

38. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

12

## ATTACHMENT A

1. The property to be searched is a SAMSUNG GALAXY S7 MODEL SM-G930T IME number [359755070494790], hereinafter the "Device." The Device is currently located at Greendale Police Department.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

1

# ATTACHMENT B

1. All records on the device described in Attachment A that relate to violations of Title 18, United States Code, Section 922(g)(1) and Section 1201 including:

   a. GPS information and any other location service data from the phone and/or from any downloaded applications from January 1, 2018, through June 9, 2018;

   b. Internet search history and browser history or location searches from January 1, 2018, through June 9, 2018;

   c. Call history from January 1, 2018, through June 9, 2018;

   d. Contact list, to include names, addresses, phone numbers, and/or email addresses;

   e. Any video and/or photograph(s) on the phone of criminal activity or of evidentiary value;

   f. Any text messages exchanged or drafted that seem to relate to firearms or other criminal activity;

2. Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of electronic storage and any photographic form.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

1